730 N.W.2d 164 (2007)
2007 WI App 45
Christopher BOWEN, Petitioner-Respondent,
v.
LABOR AND INDUSTRY REVIEW COMMISSION, Respondent-Appellant,
Stroh Die Casting, Respondent-Co-Appellant.
No. 2006AP987.
Court of Appeals of Wisconsin.
Submitted on Briefs January 3, 2007.
Opinion Filed February 6, 2007.
On behalf of the respondent-appellant, the cause was submitted on the brief of David C. Rice, assistant attorney general and Peggy A. Lautenschalger, attorney general; on behalf of the respondent-co-appellant, the cause was submitted on the briefs of Mary Pat Ninneman and Judith *165 A. Williams-Killackey of Quarles & Brady LLP, Milwaukee.
On behalf of the petitioner-respondent, the cause was submitted on the briefs of Gary Grass, of the Law Office of Arthur Heitzer, Milwaukee.
Before WEDEMEYER, P.J., FINE and CURLEY, JJ.
¶ 1 FINE, J.
The Labor and Industry Review Commission and Stroh Die Casting appeal the circuit court's order remanding Christopher Bowen's sexual-harassment complaint to the Commission for a new hearing. The circuit court determined that Bowen was prevented from introducing significant material evidence relating to his sexual-harassment contentions. See WIS. STAT. §§ 227.57(4) ("The court shall remand the case to the agency for further action if it finds that either the fairness of the proceedings or the correctness of the action has been impaired by a material error in procedure or a failure to follow prescribed procedure."); 111.395 ("Findings and orders of the commission under this subchapter are subject to review under ch. 227."). We review the Commission's decision, not the circuit court's. See Virginia Sur. Co. v. Labor & Indus. Review Comm'n, 2002 WI App 277, ¶ 11, 258 Wis.2d 665, 675, 654 N.W.2d 306, 311. We affirm, and clarify the standards applicable to the new hearing.

I.
¶ 2 Bowen started this case on April 28, 2003, when he filed a pro se complaint with the Wisconsin Department of Workforce Development, Equal Rights Division, contending that Stroh violated the Wisconsin Fair Employment Act, WIS. STAT. §§ 111.31-111.395, and checked the following boxes that summarized his complaint: "Sexual Orientation," "Homosexual," and "Termination/Discharge." (Some bolding omitted.) He also checked the following on the form:
I believe that I was retaliated against based on:
Activities protected under the Wisconsin Fair Employment Act (WFEA)
(Examples of protected activities: opposing discrimination at work or filing a complaint, testifying, or assisting in any proceeding under the WFEA; or filing a complaint under a Labor Standards law or other law covered under WFEA's anti-retaliation provision.)
(Some bolding omitted; underlining, italics, and acronyms in original.) Under the form's request for the "dates of alleged discrimination," which carried the caveat that an answer was "[r]equired to show complaint is timely," and that the Wisconsin Fair Employment Act "requires that complaints be filed within 300 days of alleged violation," Bowen gave the date of "the first alleged act of discrimination (or retaliation)," which Bowen alleged to be "harassment," as happening on "03/23/02." (Some uppercasing, bolding, and italics omitted; underlining in original.) Bowen gave the date of "the most recent action" as happening on "03/25/2003," and asserted that the "action" was "termination."[1] (Some uppercasing omitted; underlining in original.)
¶ 3 In a typed attachment to the form complaint, Bowen asserted that:
 On January 26, 2002, there was an "[i]ncident witnessed by company personnel *166 which started 5 months of daily sexual harassment." The attachment related that "during the 5 months of daily harassment from Jan. through May 02, a bumper sticker was placed on my tool box `Honk If Your [sic] Gay,'" and alleges that Bowen's "supervisor" gave the sticker to Stroh's human resource manager, James Kaufman.[2]
 On February 11, 2002, he "[n]otified Company of harassment."
 On May 22, 2002, he had a meeting with three Stroh employees, including Kaufman "regarding continuing harassment," that another employee was "charged with harassing me," and that Bowen was "[s]ent home with pay to `cool down'. [sic] Told by Mr. Kaufman this is nondisciplinary."
 On May 23, 2002, he was told by Kaufman "to get anger management," and that Bowen did so. Bowen also asserted that he was "[f]orced to sign disciplinary suspension in order to be able to return to work."
 In January of 2003, a Stroh employee with whom Bowen worked, Rick Hafemeister, pointed to doughnuts "and told me `The pink one is for you.'" Bowen noted in that entry that the "pink doughnut" incident was seen by three persons, and that Bowen "[d]id not report this to my supervisor Ron Howski right away because of my willingness to try and get along with" persons he called "the harassers."
 Those whom he described as his "harassers" complained about him, and he was "terminated on 3-25-03 . . . after [he] made numerous complaints to the company about harassment sexual harassment and unfairness."
As we have seen, Bowen filed this complaint on April 28, 2003. Three-hundred days preceding April 28, 2003, is July 2, 2002. Thus, although the notice on the form declared "that complaints be filed within 300 days of alleged violation," Bowen included in his litany of assertions against Stroh matters antedating July 2, 2002. Accordingly, Stroh's contention that it did not have notice that Bowen was complaining about those earlier incidents is without merit.
¶ 4 Bowen filed an amended complaint with the Equal Rights Division on July 24, 2003, asserting that Stroh, as phrased by the form, "discriminated or took action against me because" as noted by the box checked "of my sexual orientation," which Bowen noted in handwriting was "homosexual." (Bolding omitted.) Bowen gave the date of the first violation as "approx." February 12, 2002, and the date of the last violation as March 19, 2003. In a hand-written attachment, Bowen alleged the following incidents: (1) a newspaper article about Liberace was "put on top of locker," further alleging that his supervisor, Howski, did not report the incident to the "company," and (2) someone wrote "`queer'" on his locker, but that Howski also did not report that to the company.
¶ 5 Bowen filed another amended complaint with the Equal Rights Division on August 28, 2003. This amended complaint repeated Bowen's contention that he was the victim of adverse employment consequences because he was a "homosexual," and gave the date of the first alleged violation as "2-11-02" and the date of the last *167 violation as "3-25-03." The attachment to this third amended complaint asserted that he was fired because of "his unceasing complaints to supervisor Ron Howski of sexual harassment." (Uppercasing omitted.) It also claimed that Bowen was treated differently in connection with his termination by Stroh than was another employee with his. The attachment also complained that when he spoke to Michael E. Stroh, Stroh's president, about his being harassed and threatened to sue over it, Stroh wrote in a letter dated May 9, 2002: "After listening to the repeated threats about lawsuits and his harassment, I told Chris that if he didn't like working at Stroh he should move on." The letter was received by the examiner as an exhibit at the hearing.
¶ 6 Although, as seen in the next section, a Department hearing examiner found that none of Bowen's complaints had merit, the circuit court determined in a well-reasoned written opinion, and we agree, that under the applicable law the examiner improperly restricted Bowen's ability to fully present his case by limiting Bowen's evidence to incidents within the 300-day period starting on July 2, 2002, and that the earlier incidents were material to whether Stroh was liable for the alleged hostile work environment. Further, as we discuss below, those incidents also bore on whether Stroh fired Bowen because of his sexual orientation and his complaints that he was being harassed because of that orientation.

II.
¶ 7 Wisconsin has a broad policy prohibiting "unfair discrimination in employment against properly qualified individuals." WIS. STAT. § 111.31(1). Included in the class of those protected against "unfair discrimination" are persons who are deprived of non-discriminatory employment opportunities "by reason of their . . . sexual orientation." Ibid. It is thus illegal in Wisconsin for an employer to either sexually harass or permit sexual harassment of an employee, "or permit[] sexual harassment to have the . . . effect of substantially interfering with an employee's work performance or of creating an intimidating, hostile or offensive work environment." WIS. STAT. § 111.36(1)(b).[3]
[S]ubstantial interference with an employee's work performance or creation of an intimidating, hostile or offensive work environment is established when the conduct is such that a reasonable person under the same circumstances as the *168 employee would consider the conduct sufficiently severe or pervasive to interfere substantially with the person's work performance or to create an intimidating, hostile or offensive work environment.
Ibid.
¶ 8 Pursuant to Wis. STAT. § 111.39(4)(b), the Department investigated Bowen's complaints and determined:
There is probable cause to believe Stroh Die Casting Co., Inc. may have violated the Wisconsin Fair Employment Law, sec. 111.31-111.395, Stats., by:
A. discriminating against [Bowen] in terms or conditions of employment because of sexual orientation;
B. engaging in or permitting sexual harassment;
C. terminating the employment of [Bowen] because of his sexual orientation; and
D. discharging [Bowen] because he opposed a discriminatory practice under that Act.
Accordingly, a Department examiner held a hearing on Bowen's complaints, but did not permit Bowen to introduce any evidence antedating July 2, 2002, except to show that Stroh knew of Bowen's contentions that he was harassed because of his sexual orientation.
¶ 9 In determining that the pre-July 2, 2002, evidence was not admissible, other than for possible "notice," the hearing examiner based her ruling on Bowen's failure to show that the pre-July 2 incidents were connected with the post-July 2 "pink doughnut" incident, so as to show what the hearing examiner and the parties referred to as a "continuing" violation. In its memorandum decision affirming the hearing examiner, the Commission explained why it believed the examiner's evidentiary ruling was correct:
In his complaint, [Bowen] alleged that he was subjected to daily sexual harassment over a five-month period, from January through May of 2002. This alleged daily sexual harassment occurred prior to the limitations period and, evidently, ended when [Bowen] was moved to a different shift. [Bowen] did not allege further instances of harassment thereafter, with the exception of one discrete episode, the pink donut incident, which took place in January of 2003. While ongoing harassment beginning prior to and extending into the limitations period may be considered a continuing violation, in this case there was no allegation that the January through May incidents were part of a continuing course of conduct. Further, the sole instance of harassment which is claimed to have occurred within 300 days of the filing of the complaint-the offering of a pink donut to [Bowen]was a matter so subtle and ambiguous that the commission cannot be certain it was based on [Bowen]'s sexual orientation.
¶ 10 As we show in the next part, this was error in light of Abbyland Processing v. Labor and Industry Review Commission, 206 Wis.2d 309, 557 N.W.2d 419 (Ct. App.1996), and National Railroad Passenger Corporation v. Morgan, 536 U.S. 101, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002).[4]

*169 III.
¶ 11 The Commission's main brief on appeal contended that the circuit court should have given the Department an initial chance to assess the admissibility of evidence antedating July 2, 2002, under Morgan and Abbyland. In its letter indicating that it would not be filing a reply brief, the Commission withdrew that contention.
A. Morgan and Abbyland.
¶ 12 Morgan decided two interrelated issues relating to the time within which complaints of employment discrimination had to be filed under federal law. See footnote 4. Where only discrete acts of employment discrimination are alleged, events antedating the limitations period do not establish liability for those events:
Discrete acts such as termination, failure to promote, denial of transfer, or refusal to hire are easy to identify. Each incident of discrimination and each retaliatory adverse employment decision constitutes a separate actionable "unlawful employment practice." Morgan can only file a charge to cover discrete acts that "occurred" within the appropriate time period. While Morgan alleged that he suffered from numerous discriminatory and retaliatory acts from the date that he was hired through March 3, 1995, the date that he was fired, only incidents that took place within the timely filing period are actionable. Because Morgan first filed his charge with an appropriate state agency, only those acts that occurred 300 days before February 27, 1995, the day that Morgan filed his charge, are actionable.
Morgan, 536 U.S. at 114, 122 S.Ct. 2061 (footnote omitted). The matter is different, however, with respect to a "hostile environment" claim:
Hostile environment claims are different in kind from discrete acts. Their very nature involves repeated conduct. The "unlawful employment practice" therefore cannot be said to occur on any particular day. It occurs over a series of days or perhaps years and, in direct contrast to discrete acts, a single act of harassment may not be actionable on its own. Such claims are based on the cumulative effect of individual acts.
Id., 536 U.S. at 115, 122 S.Ct. 2061 (citations omitted); see also id., 536 U.S. at 117, 122 S.Ct. 2061 ("A hostile work environment claim is composed of a series of separate acts that collectively constitute one `unlawful employment practice.' 42 U.S.C. § 2000e-5(e)(1). The timely filing provision only requires that a Title VII plaintiff file a charge within a certain number of days after the unlawful practice happened. It does not matter, for purposes of the statute, that some of the component acts of the hostile work environment fall outside the statutory time period. Provided that an act contributing to the claim *170 occurs within the filing period, the entire time period of the hostile environment may be considered by a court for the purposes of determining liability.").
¶ 13 Morgan specifically rejected the continuing-course-of-conduct rationale applied by the Ninth Circuit in Morgan, and, apparently, by the Commission here, that permitted the introduction of acts outside the limitation period if either of two albeit related showings were made:
First, a plaintiff may show "a series of related acts one or more of which are within the limitations period." Such a "serial violation is established if the evidence indicates that the alleged acts of discrimination occurring prior to the limitations period are sufficiently related to those occurring within the limitations period." The alleged incidents, however, "cannot be isolated, sporadic, or discrete." Second, a plaintiff may establish a continuing violation if he shows "a systematic policy or practice of discrimination that operated, in part, within the limitations perioda systemic violation."
Id., 536 U.S. at 107, 122 S.Ct. 2061 (quoting Morgan v. National R.R. Passenger Corp., 232 F.3d 1008, 1015-1016 (9th Cir. 2000)) (specific citations omitted).
¶ 14 Any fair reading of Bowen's complaints (other than the one that alleged termination as his specific discrimination-injury) is that he is alleging a hostile work environment based on his sexual orientation. See WIS. STAT. § 111.36(1)(b). Thus, under Morgan that only one of the alleged incidents creating that environment happened during the three-hundred days from July 2, 2002, through April 28, 2003, does not make his hostile-work-environment claim untimely. An example given by Morgan makes this clear:
The following scenarios illustrate our point: (1) Acts on days 1-400 create a hostile work environment. The employee files the charge on day 401. Can the employee recover for that part of the hostile work environment that occurred in the first 100 days? (2) Acts contribute to a hostile environment on days 1-100 and on day 401, but there are no acts between days 101-400. Can the act occurring on day 401 pull the other acts in for the purposes of liability? In truth, all other things being equal, there is little difference between the two scenarios as a hostile environment constitutes one "unlawful employment practice" and it does not matter whether nothing occurred within the intervening 301 days so long as each act is part of the whole. Nor, if sufficient activity occurred by day 100 to make out a claim, does it matter that the employee knows on that day that an actionable claim happened; on day 401 all incidents are still part of the same claim. On the other hand, if an act on day 401 had no relation to the acts between days 1-100, or for some other reason, such as certain intervening action by the employer, was no longer part of the same hostile environment claim, then the employee cannot recover for the previous acts, at least not by reference to the day 401 act.
Id., 536 U.S at 118, 122 S.Ct. 2061. Thus, the Commission's assertion that the break in the alleged unlawful sexual-orientation harassment of Bowen makes the pre-July 2, 2002, events not admissible is contrary to Morgan, which neither the Commission nor Stroh contends in a developed argument does not apply here. See State v. Pettit, 171 Wis.2d 627, 646, 492 N.W.2d 633, 642 (Ct.App.1992) (we do not consider undeveloped contentions). Indeed, as Bowen points out, the Commission has recognized Morgan's applicability in these type of cases. See, e.g., Kanter v. Ariens Co., ERD Case No. XXXXXXXXX (LIRC Sept. 23, 2005), available at http://www. *171 dwd.state.wi.us/lirc/erdecsns/838.htm. The failure of the Commission to apply Morgan to Bowen's complaints is thus entitled to little weight. See City of Marshfield v. Wisconsin Employment Relations Comm'n, 2002 WI App 68, ¶ 9, 252 Wis.2d 656, 664, 643 N.W.2d 122, 126-127.
¶ 15 Abbyland was a sexand marital-status discrimination case under the Wisconsin Fair Employment Act. Abbyland, 206 Wis.2d at 312, 557 N.W.2d at 420. It upheld the Commission's determination that acts antedating the start of the limitations period were admissible to show "intent or state of mind" of the party allegedly violating the equal-employment law, as long as they were not "unduly remote" from the incidents alleged to be within the limitations period. Id., 206 Wis.2d at 315-316, 557 N.W.2d at 421-422.
¶ 16 We turn to the evidence excluded by the hearing examiner to determine whether it: (1) supports Bowen's hostile-work-environment claim, and thus can support a finding that Stroh is liable on that claim under Morgan, and (2) is relevant to show "intent or state of mind," under Abbyland and thus material to Bowen's wrongful-termination claim. We then consider whether exclusion of that evidence could be considered harmless, as both the Commission and Stroh argue.
B. Excluded evidence.
¶ 17 The most forceful evidence in connection with Bowen's hostile-work-environment claim was an offer of proof of what Kathryn Corroo would testify to if permitted to be called as a witness at the hearing:
I work at Stroh Die Casting on First shift with Chris Bowen. . . . I witnessed the sexual harassment against Chris Bowen especially during February 2002 through May 2002 by [co-employees] Tom Meier, Rick Hafemeister, David Lepke, Jesse Manhardt and Rose McGee. At times, the sexual harassment was too much for Chris, that he would elect to take a half day of vacation just to escape it. I heard Tom Meier say that Chris was not in a very good mood and that maybe it was because he (Chris) didn't get a apiece [sic] of ass over the weekend at Pridefest, the day after the weekend of Pridefest. I heard Rick Hafemeister make comments to Chris and myself about how all nigers [sic] and queers, etc.. [sic] should be put in a big hole and shot. And get rid of them all. I heard Rick [H]afemeister call Chris and Greg Meyer Butt Buddies when Greg Meyer stopped to talk to Chris about company business. I observed Chris submit to this type of attack for the sake of getting along with these individuals for the sake of his job. I also observed Chris complain to Ron Howski our foreman about this treatment at lest [sic] twice a week.[5]
(Footnote added.) In addition to Corroo's attesting to what certainly has all the earmarks of a hostile work environment, see WIS. STAT. § 111.36(1)(b) (A "hostile or offensive work environment is established when the conduct is such that a reasonable person under the same circumstances as the employee would consider the conduct sufficiently severe or pervasive to interfere substantially with the person's work performance or to create an intimidating, hostile *172 or offensive work environment."), her offer of proof was significant because it also directly contradicted a key finding by the hearing examiner that although Bowen "periodically made complaints to Howski about work disputes between Bowen and various co-workers involving work issues" from January of 2002 through May of 2002, "Bowen did not complain to Howski about any incident that could be considered sexual harassment because of Bowen's sex or Bowen's sexual orientation."[6] The hearing examiner's finding is consistent with Howski's testimony, but contrary to Bowen's testimony that he did, in fact, tell Howski that he was being sexually harassed at work, and Corroo's offer of proof supports Bowen's version.
¶ 18 The hearing examiner also excluded an offer of proof from another of Bowen's co-workers at Stroh, Jerald Davidson, who indicated he would testify that when Bowen and another worker, Rose McGee, disputed who would operate an apparently desirable machine, McGee responded to Bowen's comment that, as recounted in Davidson's offer of proof, Bowen's "best friend was an attorney," that she "didn't care if Chris had `Toy Boy Lawyers.'"
¶ 19 By not considering pre-July 2, 2002, evidence as it related to Bowen's claim of unlawful sexual harassment as encompassed by his complaints, the hearing examiner and the Commission ignored evidence that is material to Bowen's claim that he was subjected to a hostile work environment. The excluded evidence is also relevant to Bowen's contention that he was fired by Stroh because of his sexual orientation and his complaints about being harassed because of his orientation.
¶ 20 Stroh presented evidence at the hearing that Bowen was fired because he had two disorderly-conduct company citations within one year, the most recent of which concerned a situation where Bowen was, according to his testimony, participating in what he said he thought was good-natured fun when one of his co-workers, Meier, angrily approached him for having put a tissue in a parts box at Meier's work space. According to Bowen, Meier threatened to "take it outside" and told him that he should not be hiding behind "skirts." Bowen testified that he perceived the "skirts" remark as a reference to his sexual orientation. According to Bowen, he thought he might not have heard clearly what Meier said, and touched him on his arm to get his attention as Meier was starting to walk away. At that point, Meier spun around and shouted several times that Bowen was to never touch him. Meier told Kaufman that Bowen had forcibly spun him around. Kaufman believed Meier, after getting statements from Lepke and Hafemeister. As we have seen, Corroo's offer of proof asserts that Meier, Lepke, and Hafemeister sexually harassed Bowen.
¶ 21 Both the Commission and Stroh contend that irrespective of whether the Commission erred in upholding the hearing examiner's exclusion of the evidence antedating July 2, 2002, there is sufficient evidence to support the Commission's conclusion that Bowen's complaints are without merit. In support of that contention, *173 both the Commission and Stroh rely on testimony by Howski and Kaufman that they never knew that Bowen was being sexually harassed and that Bowen was fired for a legitimate reason unrelated to his sexual orientation. As we have seen, however, the Commission upheld the hearing examiner's exclusion of evidence that was relevant to the Commission's assessment of that testimony. It is true, of course, that "[w]hether particular conduct constitutes sexual harassment as defined in the statute is intertwined with factual determinations [and] also involves value and policy judgments about what conduct is and is not acceptable in the workplace," so that the Commission's "interpretation of the statute defining and prohibiting sexual harassment is entitled to great deference." Kannenberg v. Labor & Indus. Review Comm'n, 213 Wis.2d 373, 386-387, 571 N.W.2d 165, 172 (Ct.App.1997). But this presupposes that the Commission has considered all the relevant evidence. See WIS. STAT. §§ 227.57(4) ("The court shall remand the case to the agency for further action if it finds that either the fairness of the proceedings or the correctness of the action has been impaired by a material error in procedure or a failure to follow prescribed procedure."); 111.395 ("Findings and orders of the commission under this subchapter are subject to review under ch. 227."). Bowen is entitled to such a hearing.

IV.
¶ 22 We affirm the circuit court's remand to the Commission for a new hearing, which shall be governed by our analysis of Morgan and Abbyland.
Order affirmed.
NOTES
[1] As material here, WIS. STAT. § 111.39(1) provides: "The department [of workforce development] may receive and investigate a complaint charging discrimination [or] discriminatory practices . . . in a particular case if the complaint is filed with the department no more than 300 days after the alleged discrimination . . . occurred."
[2] Bowen's supervisor, Ronald Howski, agreed that found near Bowen's work station was an item that he described as "the size of . . . [a] legal piece of paper, . . . and it was a target that would be used like for bow and arrow hunting, and in the center there was a label that said, `honk if you're gay,'" but told the hearing examiner that although it could be considered "as being a sexual, I deemed it more as basically horseplay."
[3] As material, WIS. STAT. § 111.36 provides:

(1) Employment discrimination because of sex includes, but is not limited to, any of the following actions by any employer, labor organization, employment agency, licensing agency or other person:
. . . .
(b) Engaging in sexual harassment; or implicitly or explicitly making or permitting acquiescence in or submission to sexual harassment a term or condition of employment; or making or permitting acquiescence in, submission to or rejection of sexual harassment the basis or any part of the basis for any employment decision affecting an employee, other than an employment decision that is disciplinary action against an employee for engaging in sexual harassment in violation of this paragraph; or permitting sexual harassment to have the purpose or effect of substantially interfering with an employee's work performance or of creating an intimidating, hostile or offensive work environment. Under this paragraph, substantial interference with an employee's work performance or creation of an intimidating, hostile or offensive work environment is established when the conduct is such that a reasonable person under the same circumstances as the employee would consider the conduct sufficiently severe or pervasive to interfere substantially with the person's work performance or to create an intimidating, hostile or offensive work environment.
[4] Decisions by the United States Supreme Court are persuasive in connection with the interpretation of Wisconsin statutes when the federal statute interpreted by the United States Supreme Court is similar to the Wisconsin statute. Hannigan v. Sundby Pharmacy, Inc., 224 Wis.2d 910, 924, 593 N.W.2d 52, 58 (Ct.App.1999). The parties here do not dispute that the limitations statute interpreted in Morgan, section 706(d)(1) of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e-5(e)(1) ("A charge under this section shall be filed within one hundred and eighty days after the alleged unlawful employment practice occurred and notice of the charge (including the date, place and circumstances of the alleged unlawful employment practice) shall be served upon the person against whom such charge is made within ten days thereafter, except that in a case of an unlawful employment practice with respect to which the person aggrieved has initially instituted proceedings with a State or local agency with authority to grant or seek relief from such practice or to institute criminal proceedings with respect thereto upon receiving notice thereof, such charge shall be filed by or on behalf of the person aggrieved within three hundred days after the alleged unlawful employment practice occurred, or within thirty days after receiving notice that the State or local agency has terminated the proceedings under the State or local law, whichever is earlier, and a copy of such charge shall be filed by the Commission with the State or local agency."), is substantially similar to WIS. STAT. § 111.39(1).
[5] Stroh argues in a footnote in its main brief on this appeal that Corroo's proposed testimony would be "hearsay." With the exception of the rules of privilege, however, the rules of evidence do not apply to administrative hearings other than those to determine whether public employees have violated ethical rules. WIS. STAT. § 227.45(1) ("Except as provided in ss. 19.52(3) and 901.05, an agency or hearing examiner shall not be bound by common law or statutory rules of evidence.").
[6] Bowen testified that his co-workers' sexual harassment of him was extensive and pervasive. He told the hearing examiner that Kevin Allen, a co-worker, would refer to Bowen "as his little bitch." Bowen said that another co-worker, Jesse Manhardt, made "[h]and gestures, cock in the mouth, name calling." When asked by his lawyer how often Manhardt did "these kind of things," Bowen replied, "For a good three, four months I think." When asked about how long Allen's "actions and comments" lasted while they were both on second shift, Bowen replied, "All the time." Further, Bowen said that Hafemeister, who Bowen says told him that the pink doughnut was for Bowen, had "call[ed] me fag right to my face numerous times."